KING SHIPPING CONSUM, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ZION COPTIC CHURCH, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
King Shipping Consum, Inc. v. Commissioner
Docket Nos. 8587-78, 8829-78
United States Tax Court
T.C. Memo 1989-593; 1989 Tax Ct. Memo LEXIS 602; 58 T.C.M. (CCH) 574; T.C.M. (RIA) 89593; October 31, 1989
*602 Z is a purported "church" organized, incorporated and operated for purposes of smuggling into this country, and distributing, illegal drugs for profit. Held: activities conducted by persons affiliated with Z prior to Z's incorporation are not activities attributable to Z. Held further: Z is not a tax exempt organization under section 501(c)(3). Held further: R correctly determined the amount of Z's taxable income for the periods from the date of Z's incorporation through 1977. Held further: Z is subject to the additions to tax provided by sections 6651(a)(1), 6653(a) and 6655(a). Held further: K is liable as a transferee of Z's assets to the extent of $ 750,000. Held further: Z is liable for damages under section 6673 for the maintenance of a frivolous position in this proceeding. Richard R. Booth, for the petitioner in docket No. 8587-78. Thomas F. Reilly, (an officer) for the petitioner in docket No. 8829-78. W. Robert Abramitis, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: These consolidated cases were assigned to Special Trial Judge Daniel J. Dinan, pursuant to the provisions of section 7456(d) [1] (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) and Rule 180 et seq. For convenience, the findings of fact and conclusions of law have been combined in this opinion. The Court agrees with and adopts the opinion of the Special *605 Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: These cases were consolidated for trial, briefing and opinion. Respondent determined the following deficiencies in and additions to petitioner Zion Coptic Church, Inc.'s (ZCC) Federal income taxes: Additions to Tax Sections
Year
Deficiency
6651(a)(1)
6653(a)
6655 [2]
1974
$  67,106
$  16,777
$  3,355
$  1,946
1975
431,091
107,773
21,555
17,242
1976
186,365
46,591
9,318
6,252
1977
883,747
88,375
44,187
28,976
*606 Respondent, in a Notice of Transferee Liability dated April 25, 1978, further determined that King Shipping Consum, Inc. (King) was the transferee of ZCC assets to the extent of $ 805,426. The issues for decision are: (1) whether respondent correctly determined ZCC's income for the periods prior to April 15, 1975; (2) whether ZCC is an exempt organization under section 501(c)(3); (3) whether respondent correctly determined ZCC's income for the periods from April 15, 1975 through 1977; (4) whether ZCC is liable for additions to tax pursuant to section 6651(a)(1); (5) whether ZCC is liable for additions to tax pursuant to section 6653(a); (6) whether ZCC is liable for additions to tax pursuant to section 6654; and (7) whether King is liable for any taxes determined to be owed by ZCC, as a transferee of assets from ZCC. Some of the facts have been stipulated and are found accordingly. The stipulations of fact and exhibits attached thereto are incorporated by reference. Both petitioners' primary place of business at the time they filed their petitions was 6724 Southwest 12th Street, Miami, Florida (the 12th Street address). In the absence of adequate books and records, respondent *607 determined ZCC's taxable income for the years 1974 through 1977 by using the cash expenditures method of reconstructing income -- i.e., respondent determined that amounts of money spent by members of ZCC in the conduct of an illegal drug trade represents money belonging to ZCC. Although ZCC was not incorporated until April 15, 1975, respondent contends that he properly determined ZCC's taxable income for periods prior to that date by attributing to ZCC various transactions conducted by members of ZCC during 1974 and the first few months of 1975. Respondent asserts that such attribution is proper because such transactions were adopted by ZCC after its incorporation. Respondent cites Bell v. Commissioner, T.C. Memo. 1956-291, and Camp Wolters Land Co. v. Commissioner, 160 F.2d 84 (5th Cir. 1947), affg. in part and revg. and remanding in part 5 T.C. 336 (1945), as authority for the attribution of pre-incorporation transactions to a corporation. In Bell, a plumbing and heating partnership decided to incorporate and executed the necessary papers in October, 1947. The attorney charged with filing the papers failed to do so until *608 May, 1948. When the corporate papers were executed in October, 1947, stock was immediately issued, a corporate accounting system was put in place, corporate salaries were paid, and the plumbing and heating business held itself out as a corporation to those doing business with it. In Bell, we found that under the Articles of Incorporation executed on October 3, 1947, a new taxable entity was created. We then said: "That being true, it follows that [the taxpayer] between October 1, 1947 and May 18, 1948, inclusive, was at least an association taxable as a corporation within the definition of that term in section 3797(a)(3). Internal Revenue Code of 1939." In Camp Wolters Land Co., the Fifth Circuit held that the taxpayer-corporation had income before it was incorporated under Texas state law because the "incorporators: (a) held themselves out as a corporation; (b) made deposits in the bank, acquired leases, wrote checks, bought land, executed leases, collected rent, borrowed money, accepted contributions -- all in the name of the corporation," and "the corporation adopted the preorganization contracts of its incorporators, by recognizing them as its own and by receiving, *609 accepting, and using all the fruits thereof." Camp Wolters Land Co. v. Commissioner, supra at 87. In the cases cited by respondent, it was found that prior to incorporation there was a substantial level of activity conducted by, or in the name of, the taxpayers. In the case of ZCC, there is a significant lack of evidence that any substantial corporate actions on behalf of ZCC were carried on prior to the date ZCC was incorporated. No checking accounts were opened, no contracts were entered into, and no representations were made that ZCC's members were acting for, or on behalf of, ZCC. Accordingly, we find Bell and Camp Walters to be distinguishable from the case at bar. Respondent invites our attention to transactions by members of ZCC, conducted prior to April 15, 1975, which respondent contends were subsequently adopted by ZCC. First, on January 30, 1975, School Bus Sales Company of Waterloo, Iowa, issued a "paid in full" invoice showing the sale of a school bus to ZCC. Second, the parties have stipulated that a boat was purchased in 1974 by Thomas Dakin (Dakin), [3] one of the subscribers to ZCC's articles of incorporation. The boat was subsequently *610 renamed the "White Cloud" and its registered owner became ZCC. Respondent also points to ZCC's receipt of title to the house at the 12th Street address. That property was purchased by Alan Meyerson (Meyerson), a member of ZCC, and was not transferred to ZCC until after incorporation. That house was subsequently used as a meeting place and a residence by members of ZCC. We find respondent's attempt to attribute income to ZCC for periods prior to the date of its incorporation, because of various transactions entered into by ZCC members, to be far-reaching and unpersuasive. Therefore, we hold that ZCC is not liable for income determined by reference to expenditures by its members made prior *611 to April 15, 1975. [4]
With respect to respondent's determination of ZCC's tax liability for periods subsequent to April 14, 1975, there are two issues to be decided. First, we must determine whether ZCC was an exempt organization under section 501(c)(3). Second, if ZCC was not exempt, we must determine the propriety of respondent's reconstruction of ZCC's income for periods subsequent to April 14, 1975. On April 15, 1975, ZCC was incorporated in the State of Florida. The subscribers to the articles of incorporation were Robert F. DeMarco (DeMarco), and Peter Sheets (Sheets). The original officers of ZCC were Thomas Reilly (Reilly), President, Sheets, Treasurer, and Carl Swanson (Swanson), Secretary. The Board of Trustees consisted of Reilly, Dakin, Sheets, Swanson and Harry Shnurman (Shnurman). The purposes for which ZCC was incorporated were stated to be: A. To operate as a Church, to teach and promote the precepts and philosophy of the creed thereof, belief in the Bible and the moral laws found therein *612 and belief in the Fatherhood of God and Brotherhood of Man; to safeguard and transmit to posterity the purity and righteousness of the precepts and teachings of the organization and to teach the same to the individual members thereof; to assist in charitable work of any nature deemed beneficial and to the best interest of the organization and to society as a whole, and to raise funds for carrying the same into effect in any manner permitted by these Articles of Incorporation, the By-Laws thereof, and as may be permitted under the laws of the State of Florida and the United States of America. B. To do any and all things permitted to be done by a nonprofit corporation under the laws of the State of Florida, to wit: Sec. 617.021, Florida Statutes.
On July 2, 1975, ZCC filed a Form 1023 "Application for Recognition of Exemption" with the Internal Revenue Service. The application was returned as it was incomplete. The completed application was resubmitted on September 2, 1975. The resubmitted application stated that the objectives of the church were to-- engage in the activities usually and normally associated with churches; it will conduct services, prayer sessions; there will *613 be individual and group counseling and teaching sessions; there will be regular membership meetings for the purpose of electing trustees and officers from time to time and for other corporate purposes. On January 15, 1976, the application was granted on the condition that the articles of incorporation of ZCC be amended to reflect the nonprofit purpose of the corporation. ZCC subsequently amended its articles of incorporation. The amendment stated that ZCC would not "carry on any other activities not permitted to be carried on by * * * a corporation exempt from Federal income tax under section 501(c)(3) * * *." On March 3, 1976, tax exempt status was unconditionally granted to ZCC based upon the facts as stated in the application. As of March 3, 1976, ZCC was established as a church. Interestingly, its sacrament was one of marijuana. Respondent contends that ZCC was actually formed as a church to cloak a large commercial drug smuggling operation. ZCC contends that it was incorporated merely for the purpose of obtaining governmental recognition as a church. ZCC further contends that the only drug smuggling it engaged in was the importation of marijuana to be used as a sacrament *614 in its church ceremonies. We agree with respondent that ZCC was formed as a cover for a large commercial drug smuggling operation. The factors we look to in making such determination are: the organization and the size of the operation; the amount of the income generated; the amount of drugs imported; and the criminal nature of the enterprise. Our decision does not reflect any judgment upon the validity of the religious beliefs of members of ZCC. However, we do reject ZCC's contention that it was established merely to obtain governmental recognition as a church. The record is replete with evidence that ZCC was, in fact, a large-scale illegal commercial drug operation. Further, the record reflects that the size of the drug operation conducted by ZCC negates its contention that its drug-related activities were only in relation to its attempt to acquire a source of marijuana for use as a sacrament in its church services. The record reflects a large-scale operation by ZCC and its members which entailed the illegal distribution of drugs for profit. During 1975, ZCC purchased a Lincoln automobile for $ 10,000 and a motor home for $ 10,000. Reilly purchased real estate in Dunnellon, *615 Florida (the Dunnellon property), for $ 7,900. Meyerson purchased an adjoining lot for $ 7,900, a screening room for the Dunnellon property for $ 5,040, two mobile homes for a total of $ 17,040, and a trailer for $ 3,000. Sheets purchased a residence at 43 Star Island, Miami Beach, Florida (the Star Island property) for $ 270,000, and built a dock there for $ 5,800. The Star Island property then became the meeting place for ZCC members, and was titled in the name of Jacquelyn Renee Town, Sheets' wife. Dakin purchased two boats for a total of $ 16,207. William Reid (Reid) purchased a Boston Whaler for $ 2,750. Speed boats like the ones purchased by ZCC's members are commonly used in the drug trade to run drugs from freighters past Coast Guard patrols. On August 12, 1975, Sheets, acting as a resident agent, incorporated Coptic Container Corporation (CCC) under the laws of the State of Florida. The directors of CCC were Sheets, Reilly, and Swanson. Swanson was the sole subscriber. The address given for CCC was the address for the Star Island property. During 1975, CCC purchased a 153 foot sea-going coastal freighter for $ 200,000. The negotiations for purchase were made by *616 Sheets and Dakin. CCC also purchased a Magnum boat for $ 2,000 and "Peter's Boat" for $ 265,000. During 1976 various members of ZCC, including Reilly, Sheets, Dakin and Swanson made similar purchases of automobiles, real estate and boats, including the "Our Seas," a 62-65 foot ocean going yacht, totalling $ 416,386. In 1977, expenditures by members of ZCC in their drug operations approximated $ 1,869,264. [5] $ 1,400,000 of this figure is the approximated value of 14 tons of marijuana seized by law enforcement officials on the Dunnellon property titled in the names of Reilly, Meyerson and Sheets. On July 12, 1977, Reid and Robert Lawler (Lawler) were arrested in New Jersey with 1,150 pounds of marijuana in their van. On November 23, 1977, DeMarco was arrested when 80 pounds of marijuana was discovered in his mobile trailer. As a result of the DeMarco arrest, the Dunnellon property was searched and 14-1/2 tons of marijuana was seized. The marijuana was stored in metal containers in subterranean vaults built underneath barns on the Dunnellon property. Authorities also seized in the Dunnellon raid: *617 (1) a pick-up truck licensed to Swanson; (2) two buses with ZCC written on the side and blacked out windows; (3) a Peterbilt tractor-trailer registered in the name of Aaron Swanson, Swanson's one-year old son; and (4) farming equipment for making bales. All of this equipment contained traces of marijuana. In addition, seven members of ZCC were arrested, including Swanson and Reid. On February 1, 1978, in Crystal River, Florida, the Florida Marine Patrol and the Coast Guard seized and searched the "Our Seas." The yacht was in a secondary channel of the river. Bales of marijuana were being off-loaded through a portal on the side of the boat. In the raid, 16 individuals were arrested including Shnurman, Reid, Swanson and Reginald Toney (Toney). The properties seized at the time of the arrest were a Cadillac Seville, a pick-up truck, a motor home, two buses, a gooseneck trailer, a 25 foot motorboat, the "Our Seas" and approximately 19 tons of marijuana. In August 1978, the "White Cloud" was seized by the Coast Guard. At the time of seizure, the "White Cloud" contained marijuana residue. Five members of ZCC were arrested. In 1979, Reilly met with undercover Drug Enforcement Administration *618 (DEA) agents at the Star Island property. Reilly discussed with the DEA agents the possibility of purchasing marijuana for between $ 120 and $ 160 per pound. No purchase resulted from these discussions but Reilly told the DEA agents that arrangements for delivery of the drugs could be made. Also during 1979, Swanson was killed in a private plane crash in the Everglades. The plane contained 1,500 pounds of marijuana. Within a four month period during 1977 and 1978, members of ZCC were arrested for possession of over 33 tons of marijuana. ZCC's witnesses testified that the United States membership was between 45 and a couple thousand members. Even using the estimate most favorable to ZCC, each member would have to smoke over 33 pounds of marijuana in four months for religious purposes. This amount of marijuana reflects only two of ZCC's shipments of marijuana and it is impossible to determine how much marijuana escaped detection by law enforcement agents. Clearly, the amount imported far exceeded the needs of ZCC's members for religious ceremonies. Further, ZCC's activities were not carried on with the openness normally associated with a church. In fact, ZCC activities were *619 carried on with a definite criminal bias. Members of ZCC all had numerous aliases. Many of ZCC's activities were conducted in secret, beyond public view. The Dunnellon property, where 14 tons of marijuana were seized, was in a remote and undeveloped area and the marijuana was stored underground, hidden from inquiring eyes. In addition, the seizures and arrests on the Crystal River were made at night while the members of ZCC were trying to cloak their illicit activity in darkness. Because ZCC's activities were so embroiled in drugs, it was inevitable that some of its members would be arrested on various criminal charges for trafficking in narcotics. In anticipation of such eventualities, ZCC arranged with Schaefer Bonding Service (Schaefer), an agent of Accredited Surety and Casualty Company (Accredited Surety) of Orlando, Florida, to provide bail bonds for its members. On December 6, 1977, Schaefer executed an appearance bond in the amount of $ 100,000 for Swanson, who had been arrested on charges of criminal narcotics violations. The indemnitor on the bond was CCC and the collateral posted was a freighter valued at $ 350,000. Accredited Surety would not accept the freighter *620 as collateral on the bond because it had no way of controlling the collateral or determining its value. $ 100,000 of the value of ZCC's equity in the Star Island property was then substituted as collateral for the freighter. In 1980 or 1981 (the record is not clear on this point), Reilly, Dakin, Shnurman, Lawler, Sheldon Woodward (Woodward), Anne Mary Morrison (Morrison), Clifton Middleton (Middleton), Irving Imoberstag (Imoberstag), Jeffrey Brown (Brown) and others were convicted in the United States District Court for the Southern District of Florida on various counts of possession of marijuana with intent to distribute. All of those named are members of ZCC. ZCC argues that its drug-related activities were merely in pursuit of marijuana to be used as its sacrament. It is apparent, however, that religion was not the reason why ZCC was engaged in an illegal drug enterprise. For us to believe ZCC's contention that its importation of marijuana was for sacramental purposes only, we would have to, prior to rendering our opinion, partake of ZCC's sacraments to the extent allegedly celebrated by its members during the four month period previously discussed. ZCC's argument that its *621 drug related activities were sacramental in nature is nonsensical, absurd, and ridiculous, and we dismiss it out of hand. ZCC bears the burden of proving that respondent's determination of taxable income is incorrect. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). At trial, ZCC's representative, Reilly, contended that ZCC had been confused with the Ethiopian Zion Coptic Church (EZCC). We are singularly unpersuaded by ZCC's ludicrous argument that its drug smuggling activities were actually the activities of EZCC and that the purchases and sales of marijuana were actually by individuals who were members of EZCC and not of ZCC. To support its preposterous contention that ZCC had been mistaken for EZCC, ZCC called two witnesses. ZCC's first witness was Carl Olson (Olson). He was questioned by Reilly, president of ZCC and its representative at trial. When asked what his occupation was, Olson testified that he was a member of EZCC and that he administered prayer and took care of the legal functions of the Church. Olson resided at the Star Island property. When *622 asked if he was familiar with a Florida Corporation by the name of Zion Coptic Church, Inc., Olson responded that he had heard of ZCC but that he was not a member of it. Reilly then asked Olson if he knew some of the persons previously referenced herein as being members of ZCC. Olson testified that he knew all of the alleged members of ZCC as members of EZCC who lived in America. The next witness for ZCC was Reilly. Reilly testified that he traveled to Jamaica in 1970 where he was introduced to EZCC. The sacrament of EZCC is, conveniently enough, also marijuana, and Reilly apparently spent much time in Jamaica learning the teachings of EZCC. At one point, Reilly overstayed his welcome in Jamaica and was deported because his visa had expired. Reilly, while traveling under an assumed name, met Swanson in Jamaica during 1974. Swanson told Reilly that Swanson and others were interested in establishing a United States branch of the EZCC. Reilly testified that he had already tried to establish the EZCC in the United States but gave up his attempts after he was told by a couple of banks that he needed an IRS taxpayer identification number to open a church bank account. It is clear *623 that these two witnesses were called on ZCC's behalf in an attempt to insulate ZCC from the multitude of drug dealers named throughout this opinion and to make it appear that the drug-related activities discussed above were actually attributable to EZCC, not ZCC. We simply do not believe the concocted testimony of Olson and Reilly. Olson and Reilly are completely incredible and we attach no weight whatsoever to their testimony. There is no evidence in the record to support ZCC's spurious arguments that it was an organization described in section 501(c)(3), that the drug dealing activities of its members should be attributed EZCC and not to ZCC, or that ZCC's drug activities were only for sacramental purposes. To the contrary, the entire record compels us to conclude beyond a doubt that ZCC conducted a large commercial drug smuggling operation for profit from April 15, 1975 through 1977, and we so find. A retroactive revocation of an organization's section 501(c)(3) status "is normally appropriate were [the Commissioner] has not been fully or correctly informed as to material facts *624 on which his ruling was based or where there have been material changes in law or fact subsequent to the time the original ruling was issued." Lowry Hospital Association v. Commissioner, 66 T.C. 850, 860 (1976). Further, it is settled law that an exempt organization may not carry on criminal activities and still retain its exemption. Church of Scientology of California v. Commissioner, 83 T.C. 381, 504 (1984), affd. 823 F.2d 1310 (9th Cir. 1987), cert. denied 484 U.S. 871 (1988). We find that ZCC was formed with the intent to smuggle into this country and distribute illegal drugs for profit. ZCC knew such was its purpose when it was incorporated. It is clear that ZCC materially misrepresented the facts in its application to the IRS pertaining to its founding and operation, when ZCC stated that it would not carry on any activities "not permitted to be carried on by a corporation exempt from Federal income tax under section 501(c)(3) * * *." Because of such material misrepresentations, we further find that respondent was correct in retroactively revoking the tax-exempt status of ZCC. Finally, we find that *625 ZCC has failed to prove that respondent erred in his determination of ZCC's Federal income tax liabilities for the period April 15, 1975 through 1977. Accordingly, we uphold respondent's determination of deficiencies with respect to those periods. Further discussion of ZCC's ridiculous arguments concerning respondent's determination of deficiencies in tax for the years at issue would only tend to give credence to ZCC's preposterous assertions. We will not act to give any credence to arguments which are patently frivolous. The next issues we must address are respondent's determinations of the failure to file addition to tax under section 6651(a)(1), the negligence addition to tax under section 6653(a), and the failure to pay estimated taxes addition to tax under section 6655. We have already found that ZCC blatantly misrepresented facts to the Commissioner in its application for exemption from tax. Therefore, by no stretch of the imagination can the determination letter that ZCC received from the Commissioner be relied upon by ZCC as "reasonable cause" for its failure to file a return and pay estimated taxes. ZCC did not rely, in good faith, upon the determination letter issued *626 to it by the Commissioner because ZCC was aware that the Commissioner's letter to it granting it a tax exemption was due to ZCC's own obvious misrepresentation of facts. Furthermore, ZCC failed to file returns for 1975 through 1977, even after respondent revoked its tax exempt status. Accordingly, ZCC is subject to the additions to tax provided by section 6651(a). The additions to tax for negligence also apply. The record in this case reeks of ZCC's negligence in affairs concerning its Federal income tax liability. Just one example of ZCC's negligence is its failure to maintain records from which its income could be determined. A failure to maintain records is telling evidence of negligence. Schroeder v. Commissioner, 40 T.C. 30, 34 (1963). Again, ZCC cannot rely on the determination letter to negate its negligence because ZCC was not acting in good faith. Finally, the additions to tax for failure to pay estimated tax is mandatory unless ZCC can establish the applicability *627 of one of the computational exceptions provided by section 6655(d). See Grosshandler v. Commissioner, 75 T.C. 1, 18-19 (1980). ZCC has not done so. Accordingly, we find that respondent was correct in determining additions to tax for ZCC's failure to pay estimated taxes pursuant to section 6655. A concession having been made by respondent, the final issue for decision in docket No. 8587-78 is whether King is liable for the taxes and additions to tax determined to be owed by ZCC, as a transferee of ZCC assets to the extent of $ 781,443.60. Respondent argues that King is liable as a transferee under section 6901. That section permits respondent in certain circumstances to collect taxes owed by a transferor from a transferee of the transferor's assets. Mysse v. Commissioner, 57 T.C. 680 (1972). The burden is upon respondent to prove transferee liability. Section 6902(a); Rule 142(d). In order to carry his burden, respondent must prove the following: *628 (1) a transfer of property to the transferee; (2) that the transfer was made for inadequate consideration; (3) that the transferor/taxpayer was insolvent at the time of the transfer or became insolvent as a result of the transfer; (4) the value of the property transferred; and (5) that the transferor/taxpayer has not paid the tax asserted. Alonso v. Commissioner, 78 T.C. 577, 580 (1982); Moran v. Commissioner, 45 T.C. 528 (1966). King has stipulated that it will abide by the decision of this Court in Zion Coptic Church, Inc. v. Commissioner of Internal Revenue, docket No. 8829-78, as to the tax liability of Zion Coptic Church, Inc. Above, we have sustained respondent's determination of ZCC's tax and additions to tax. In 1978, King purchased a yacht named the "Framar." Respondent contends that the money paid by King to purchase the "Framar" was provided by ZCC to King, and that such transfer of property was without adequate consideration. The negotiations for the purchase of the "Framar" began when Dakin and several other men contacted Russell Thomas (Thomas), a Florida yacht broker, and informed him that they were *629 looking for a boat over 100 feet in length. In November 1977, Thomas made inquiries into the availability of boats fitting that description and ultimately contacted certain persons residing at the Star Island property and told them that the yacht "Framar," located in New Jersey, fit their needs and was for sale. On November 23, 1977, Thomas chartered an aircraft and flew to New Jersey with Dakin, Lawler, Reid, and Toney to examine the "Framar." On November 28, 1977, Dakin delivered to Thomas $ 75,000 in cash to apply toward a down payment for the purchase of the "Framar." On that same date, a "Purchase Agreement and Deposit Receipt" (the Agreement) was prepared by Thomas. The Agreement provided for the purchase of the "Framar" by King for $ 750,000. The agreement was signed by the seller and by Irene Morrison (Morrison), for King, as purchaser. Morrison is Dakin's wife. The balance of the purchase price of $ 675,000 was to be paid by December 28, 1977. On November 30, 1977, articles of incorporation were prepared for King. The articles state that the name of the sole stockholder, director and president of King is Morrison. The articles further state that the address of *630 King and of Morrison is the same as that of the 12th Street property, which is, again, a house titled in ZCC's name. Shortly after November 1977, the Florida Department of Law Enforcement raided the premises at the Dunnellon property, where they seized, inter alia, 14 tons of marijuana. Arrested in the raid were Swanson, Reid, Imoberstag, and Morrison. Soon after the raid on the Dunnellon property, numerous people, including Dakin, Swanson, Reid and Sheets advised Thomas that they would be unable to comply with the December 28, 1977, deadline for payment specified in the agreement. Further negotiations ensured and the required deposit was increased to $ 90,000. The additional $ 15,000 agreed to was also paid to Thomas in cash. Payment of the remaining $ 660,000 was secured by a note which would not bear interest if the full amount remaining due was paid by February 28, 1978. The final full payment was timely, and was delivered to Thomas on February 28, 1978. Payment was effected at a shopping center by several men in a station wagon. Payment was in cash which was wrapped in green baggies contained in a paper bag and an athletic bag. Thomas only recognized Sheets when he *631 received the $ 660,000 in cash. Thomas testified that he did not look at the rest of the occupants in the station wagon because he was too concerned with the fact that he had just been handed $ 660,000 in cash. Respondent argues that the individuals involved in the "Framar" purchase were inextricably linked to ZCC. Morrison was the president and sole shareholder of King. She was a director of a boat charter company which leased boats allegedly used in ZCC's drug running enterprises, and she was married to Dakin. Dakin made the original inquiries about the "Framar" and was an incorporator of ZCC. Dakin also flew to New Jersey to inspect the "Framar", and paid in cash the deposit payments for its purchase. Sheets, who was involved in obtaining the extension of time within which to consummate the purchase of the "Framar" and who was present at the meeting at the shopping center, was a member of ZCC and was the owner of several pieces of property in Dunnellon, Florida, which were used by ZCC in its illegal drug activities. Finally, the various people with whom Thomas dealt during the negotiations for the purchase of the "Framar" were Dakin, Swanson, Reid, Sheets, Toney and Gordon. *632 At various times during his dealings with these people, they all represented themselves as being members of ZCC. ZCC's surreptitious operations in the conduct of its criminal enterprise necessarily frustrate any attempt to submit direct proof of its drug smuggling activities. No books were kept, the various participants used numerous aliases, huge amounts of cash changed hands and no lists of those who were members of ZCC were kept. Accordingly, we must rely upon circumstantial evidence for our findings of fact on this issue. The existence and extent of transferee liability is determined under state law. Commissioner v. Stern, 357 U.S. 39 (1958). The applicable local law in this case is Florida Statutes Annotated section 726.01 et seq. (West 1988). Under that statute, a conveyance in fraud of a debtor's creditors is void as to such creditors. Further, under Florida law, a conveyance without consideration by one who is indebted at the time of the transfer is presumptively fraudulent, regardless of the actual intent of the transferor. Ostend Realty Co. *633 v. Biscayne Realty and Insurance Co., 99 Fla. 1221, 128 So. 643 (1930). We have found that respondent's determinations of ZCC's Federal income taxes and additions to tax for the period April 15, 1975 through 1977, are correct. Regardless of when a transferor's Federal taxes are actually assessed, a transferee is retroactively liable for the transferor's taxes in the year of the transfer and prior years, to the extent of the assets received from the transferor, even though the transferor's tax liability was unknown at the time of the transfer. Kean, Transferee v. Commissioner, 91 T.C. 575, 603 (1988). Respondent has introduced evidence that various sums of money were paid to Thomas to purchase the "Framar" by members of ZCC. From this, we are able to draw the reasonable inference that such members of ZCC were acting as agents of, or on behalf of, ZCC when transferring such money to King. Based upon the record in these consolidated cases, we are completely convinced that ZCC was the source of funds used by King to purchase the "Framar. *634 " We are further convinced that ZCC received nothing from King in exchange for that money. Therefore, respondent has convinced us, and we find, that King was the transferee of ZCC assets, for inadequate consideration, in the amount of $ 750,000. Further, based upon the evidence presented, we find that ZCC was made insolvent as a result of the transfer of money to King. As of March 1, 1978, ZCC had only two assets, the "White Cloud" and the 12th Street property. The "White Cloud" was sold for $ 30,000 by the IRS, and ZCC had equity in the 12th Street property of approximately $ 5,000. As of March 15, 1977, the due date of ZCC's nonexempt corporate tax return for 1976, ZCC owed respondent at least $ 248,526 (i.e., the deficiency and additions to tax for 1976). Accordingly, with ZCC retaining only approximately $ 35,000 as of March 1, 1978, and with ZCC owing respondent at least $ 248,526 as of March 15, 1977, it is clear that ZCC's transfer of $ 750,000 to King between November 28, 1977 and February 28, 1978, rendered ZCC insolvent. Further, it is clear that ZCC has not paid its Federal tax liabilities. We find respondent's evidence sufficient to establish a prima facie case *635 that King is the transferee of assets from ZCC. The burden of going forward to disprove respondent's prima facie case is on King. King called no witnesses to explain the source of the funds it used for the purchase of the "Framar." Morrison was particularly conspicuous by her absence from trial. "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." Wichita Terminal Elevator Co. v.Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We make such presumption in the present case. Accordingly, we hold that King is liable as a transferee of assets from ZCC. The frivolous nature of the argument concocted by ZCC concerning its importation and distribution of drugs leaves us wondering why respondent did not move for damages under section 6673. Although ZCC prevailed with respect to respondent's determination of unreported income for 1974 and the first three months *636 of 1975, ZCC's arguments concerning the rest of 1975 and all of 1976 and 1977 are so patently absurd and frivolous that it is apparent they were raised only for purposes of delay. The maintenance of such arguments in this Court is an insult to the intelligence of any rational human being, no less that of a judicial body. Accordingly, upon our own motion, we hold petitioner ZCC liable for damages under section 6673 in the maximum amount allowed by law -- i.e., $ 5,000. Decisions will be entered under Rule 155 in docket Nos. 8587-78 and 88229-78. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. In his notice of deficiency respondent determined petitioner Zion Coptic Church (ZCC) was subject to the addition to tax under section 6654, Failure by Individual to Pay Estimated Income Tax. Section 6655, Failure by Corporation to Pay Estimated Income Tax, was put at issue, however, by the petition which alleges respondent erred in determining ZCC was subject to such addition to tax, and by respondent's assertion on brief, which was not disputed by petitioner, that respondent's reference to section 6654 instead of section 6655↩ was merely an inadvertent typographical error.
3. Thomas Dakin was also known as Bradford Eldo and Bradford Eldo Rush. Virtually every member of ZCC had at least one alias. For example, Thomas F. Reilly, Zion Coptic Church's president, also went by the names Ronald Sims, Ronald Jeffrey Sims, Brother Louv, and Brother Tommy. To make our opinion more simple we will use the most commonly used name of each individual even though he or she may have signed a particular document or may have been known to a witness by one of their aliases.↩
4. Respondent will need to adjust ZCC's 1975 income to reflect the partial year of corporate existence and to reflect only expenditures made after April 14, 1975.↩
5. This figure includes a $ 90,000 down payment on the vessel "Framar."↩