## CAMP WOLTERS LAND CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 11642.

Circuit Court of Appeals, Fifth Circuit.

Feb. 27, 1947.

WALLER, Circuit Judge, dissenting in part.

———◆———

R. B. Cannon, of Fort Worth, Tex., for petitioner.

Douglas W. McGregor, Asst. Atty. Gen., Hilbert P. Zarky, Robert N. Anderson and Paul F. Mickey, Sp. Assts. to the Atty. Gen., Sewall Key, Acting Asst. Atty. Gen., J. P. Wenchel, Chief Counsel, and Charles E. Lowery, Sp. Atty., Bur. Int. Rev., both of Washington, D. C., for respondent.

Before McCORD, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

The taxpayer has admittedly been a Texas corporation since April 25, 1941, but the controversy here revolves chiefly around its status—corporate or otherwise—between that date and the middle of February in the same year at, and after, which time its incorporators made contracts in the name of, and in behalf of, the taxpayer before its charter had been filed with the Secretary of State as required by Texas law. [Unless otherwise noted all events were in 1941.]

The facts found by the Tax Court may be summarized as follows:

Prior to January 1 the City of Mineral Wells, Texas [hereafter referred to as "the City"], had leased six or seven thousand acres of lands from the owners and in turn sub-leased to the United States for use as an Army camp. Shortly thereafter it was determined that the acreage so leased was inadequate. When the City attempted to lease further acreage from the owners in the selected area it found that the owners were willing to sell, but not to lease, their land. Being then involved in municipal bankruptcy proceedings, the City was financially unable to purchase these lands. Thereupon a group of business men in the City, in order to prevent the loss of the Army camp, agreed to organize a corporation which would purchase them with funds obtained from stock subscriptions. They began negotiations to this end early in January, 1941, with the owners of these lands. They also made an oral agreement with the City that it would lease the lands when so acquired and that it would in turn sublease them to the United States. Simultaneously, and for the effectuation of the foregoing plan, the men began to organize a corporation (the taxpayer) with a capital stock of $60,000.00. By the middle of February all of the capital stock had been subscribed and by March 16 $41,500.00 had been paid in. Two local banks then loaned "Camp Wolters Land Company" the total sum of $19,482.08. A donation in the sum of $750.00 was also received. These funds, in excess of $61,700.00, were deposited in the bank in the name of the taxpayer, of which $52,952.60 were paid to Windham, Lamkin, Keener, Johnson, Watson, and Brock between March 17 and March 29 for deeds which were executed in the name of the corporation.

Four other tracts were leased from the owners in the name of the corporation and on March 1 a lease to the City from "Camp Wolters Land Company, by A. H. Guinn, President, attest, S. C. Myers, Secretary," was signed, although not acknowledged until the 8th of May. Nevertheless, the lease became operative on March 1, on which date the United States went into possession. The lease rental to be paid by the City was $10,901.02 per year for the first three years and $12,501.02 per year thereafter. It was an annual lease, renewable from year to

year at the City's option, and was renewed in 1942, 1943, and 1944.

Prior to January the City had leased from the owners, Deakins, Maddux, and Sullivan, certain other tracts, which it thereafter sub-let to the Government, wherein the owners had each reserved small tracts of from five to ten acres on which their homes and other improvements were situated. Some time in February, however, it was discovered that these reserved tracts would be in the direct line of fire and that the improvements thereon would have to be purchased, torn down, and removed, the accomplishment of which was made a condition precedent by the Army to a continuation of the construction of the firing range for which the taxpayer's lands had been leased. The City had no money with which to purchase and remove these houses and in consequence the group, acting on behalf of, with the funds of, and in the name of, the taxpayer, bought those improvements, had same demolished and removed. Checks from the funds on deposit in the name of the taxpayer, on the dates, to the payees, and in the amounts as follows, were issued:

March 18, 1941 Deakins ....... $3,500.00
March 18, 1941 Maddux ....... 1,750.00
March 19, 1941 Sullivan ....... 4,000.00

Total ................... $9,250.00

The improvements were sold for $1,000.00 and were removed some time in April. The United States paid taxpayer $1,600.00 as expenses for the removal of the demolished improvements. A net loss from the sale of these improvements of $6,650.00 resulted. It was necessary to purchase and remove these buildings in order to secure a tenant, and to realize on the lease.

In 1942 a fire partially destroyed some of the uninsured improvements on one of the tracts which the taxpayer had purchased, causing a loss of $2,187.50. The peach orchard of 3180 trees on the Lamkin tract was also destroyed due to the refusal of the Army to allow the lessee access to the tract so as to care for the orchard.

The constant and heavy bombardment carried on by the Army put the houses on the Windham and Brock tracts in such bad condition that they had no salvage value. In 1943 the Army was allowed to use these houses in connection with its training in street fighting. For the deterioration thus incurred petitioner claimed depreciation of $2,353.41 in its 1941 return and $3,906.25 in its 1942 return, both of which were, with equal facility, disallowed by the Commissioner.

The corporation failed to file an excess profits tax return on December 31, 1941.

The Commissioner disallowed: (1) any deduction for the loss on the improvements which had to be torn down on the Deakins, Maddux, and Sullivan tracts; (2) any loss caused by the fire on the Windham tract; (3) any loss on the peach orchard on the Lamkin tract; (4) any depreciation that occurred by virtue of the damage to the various improvements on the lands owned by the taxpayer caused by the heavy firing.

Moreover, the taxpayer's return was made on the theory that it was organized and in existence for tax purposes not later than March 16, 1941, but the Commissioner determined that it was not organized for tax purposes until May 8 and that it, accordingly, should pay an excess profits tax deficiency in the sum of $253.23 and a penalty of $65.82.

The Tax Court sustained the Commissioner in every respect except that it held that the corporate existence of the taxpayer began on April 25 instead of May 8, and that the earlier date should be used in determining the taxpayer's tax liabilities.

In sustaining the Commissioner the Tax Court decided that:

1. The $6,650.00 loss on account of the purchase and removal of the improvements from the Deakins, Maddux, and Sullivan tracts occurred in April but it was not shown whether it occurred before or after April 25 or whether or not it was the result of transactions by corporation's organizers or by the corporation and were not transactions of the taxpayer.

2. There was no adequate proof of any cost basis to the taxpayer of the improvements destroyed by fire.

3. There was no adequate proof of any cost basis to the taxpayer to support the deductions claimed for depreciation.

4. The taxpayer's corporate existence began April 25 instead of March 1, the date upon which it made its lease, or March 16, when it began to acquire certain properties, and that the date upon which it filed its charter with the Secretary of State should be used as the date by which the annualization of excess profits income should be reckoned.

5. The lease rentals for the period from March 1 to April 25 when the charter was filed should be chargeable to the corporation because the pleadings were insufficient to authorize the charging of same to the incorporators of the petitioner, or to them as an association which under the statute requires them to be taxed as a corporation. [Section 3797(a) (3), I.R.C., 26 U.S.C.A. Int.Rev.Code, § 3797(a) (3).]

6. The contention of the petitioner that $6,650.00, the net cost of acquiring and demolishing the three residences was either (a) an expense of obtaining a tenant under a one-year lease, deductible in full from the 1941 income, or (b) an expenditure amortizable over the life of the lease and any reasonably foreseeable renewals thereof which together did not exceed a period of five years, must be overruled because the petitioner had not established that it acquired, sold, and removed the improvements after it came into existence on April 25, although the loss occurred some time in April.

7. The petitioner was not entitled to depreciation claimed on the building, orchard, or improvements on the tracts which it owned because of its failure to segregate the cost of the improvements from the value of the land.

8. The taxpayer was not entitled to recover for the loss occasioned by the fire on the Windham tract because of the inadequacy of the proof as to the value of the improvements destroyed by fire.

In other words, it found that it was all right to charge the taxpayer with all of the income received by virtue of the transactions which its incorporators carried on in its name and in its behalf and with its funds before its charter was filed with the Secretary of State, but that it was not permissible for such taxpayer to be allowed any deductions for losses which occurred while such income was being earned for it. It seems to one not possessed of a specialized tax competence that if the tax consequences here are to be measured solely by the date upon which the corporation filed its charter with the Secretary of State, then one of three results must occur. Either the tax consequences will be: (1) those of the incorporators for that period of the year while they were acting as partners; or (2) those of an association taxable under Sec. 3797(a) (3) as a corporation; or (3) those of the corporation because of its having adopted and received the benefit of the transactions of its incorporators.

In the present case the incorporators: (a) held themselves out as a corporation; (b) made deposits in the bank, acquired leases, wrote checks, bought land, executed leases, collected rent, borrowed money, accepted contributions—all in the name of the corporation.

We recognize the legal postulate that, before the ordinary relation of principal and agent can be formed, there must be a principal in esse. [10 Tex.Jur. p. 599, § 11.]

We agree that a promoter who purports to act in behalf of a projected corporation, or a corporation not yet in existence, cannot be treated as an agent of a principal not then in existence, and where there is nothing more than a contract by a promoter in which he undertakes to bind the future corporation, in the absence of proof that the corporation when organized adopted, either expressly or impliedly, the contract of its promoter as its own, such a contract cannot be enforced under the law of Texas.[1] But even if this were a suit in which it was sought to enforce the contracts of the incorporators against the corporation, there could be no escape from the fact that the corporation adopted the preorganization contracts of its incorporators, by recognizing them as its own and by receiving, accepting, and using all the fruits thereof. Not only does it have the title to

the lands which were purchased with the funds raised for it by the issuance of its stock, but it also received the entire income derived from the contracts that were made in its behalf by its promoters. These acts clearly amount to an adoption of the pre-organization contracts.

However, this is not a suit to enforce a contract against the taxpayer, but it is one whereby the taxpayer stands before the Court asserting that the income belonged to it and that it had adopted and carried out every contract which its incorporators made antecedent to its becoming a completed legal entity. After its incorporators had: held it out as a corporation, bought land, made leases, made deposits, borrowed money, issued checks, all as a corporation, does anyone think for a moment that the taxpayer could defend against the assessment of taxes on the income thus received on the ground that the income was derived from business transacted by it before it filed its articles, and thus take advantage of the delay and default of its own incorporators?

Moreover, even though at the time of the acquisition of the deeds and leases and the other contracts by the incorporators of taxpayer, there was no fully born corporation in being and in consequence the title to the property thus acquired vested in the incorporators instead of the corporation, such incorporators would hold the title in trust as constructive trustees who could be compelled to convey the title to the corporation upon its coming into lawful being. William Cameron and Company v. Trueheart, Tex.Civ.App., 165 S.W. 58; 10 Tex.Jur. p. 600, § 11. Likewise the grantors, having knowingly accepted the taxpayer's money for the land, could be required to execute an effective deed.

■ The income derived from the property so purchased, or leased, by the incorporators for the taxpayer was also held in trust for the corporation to be formed. Income from property should ordinarily go to him who is the beneficial or real owner and income taxes ought to be laid against him who owns the income. Since the corporation was the beneficiary of the income so held in trust for it, and since the law allows certain deductions and losses incurred in the production of such income, the taxpayer here was entitled to such deductions as would have been available to it had it been duly and legally incorporated prior to any of the transactions by its incorporators under consideration here.

We conclude:

1. That the loss of $6,650.00 occasioned by the purchase, demolition, and removal of the improvements on the Deakins, Maddux, and Sullivan tracts was an expense incident to securing the lease and obtaining a tenant that should be amortizable over the life of the lease and any reasonably foreseeable renewals thereof, not to exceed the period of five years, irrespective of whether the taxpayer acquired, sold, and removed the improvements before or after April 25.

2. That the petitioner was entitled to claim depreciation on the orchard and on the other improvements on the land which it purchased in fee simple.

3. That the petitioner was entitled to claim a deduction for the loss that occurred by fire.

4. That in the annualization of excess profits tax the entire period in which the income was in process of production should be used.

■ A majority of the Court is of the opinion that the evidence as to the cost or value of the improvements upon which depreciation is claimed and upon which the fire loss occurred was insufficient, hence the claimed depreciation was properly disallowed.

The writer, standing alone, is of the opinion that there was undisputed evidence that the 3180 peach trees (which depreciated so as to become worthless by reason of the inability of the taxpayer to have access for their care and cultivation) were worth $2.00 each at the time of the sale to taxpayer and that depreciation thereon should be allowed. The initial cost of planting a peach orchard should not be the test because an orchard increases in value as its productivity increases with the growth, care, and cultivation of the trees. Within

the reasonable productive life of the tree its value is not static. The writer believes that the witness, Lamkin, who sold the tract to taxpayer, who planted and cultivated the peach orchard, and who sold $2,200.00 worth of fruit off the young (four-year-old) trees in 1940, definitely established a basis upon which depreciation should have been allowed.[2]

We are in agreement that the decision of the Tax Court was not in accordance with law in holding that the deduction of $6,650.00 was not allowable to the taxpayer because the transactions out of which such claimed deductions arose occurred prior to April 25, 1941, and that, moreover, it was error to compute an excess profits tax (and penalty) as if the income from the corporation had accrued only after said date.

The judgment is reversed insofar as it denied taxpayer the aforementioned deduction of $6,650.00, and insofar as the annualization of the excess profits tax was based upon occurrences subsequent to April 25, 1941, but in all other respects the judgment of the Tax Court is affirmed, and the cause is remanded for further proceedings not inconsistent herewith.

Affirmed in part and reversed and remanded in part.

---

[2] Mr. Lamkin testified:

"I bought the property in 1934. I gave him $35.00 an acre for it, but there were some back taxes and various other things that made it add up (to more). I don't remember just what the amount was but it was something over $4,000.00. * * *"

"I told them (meaning the group that bought the place) if they would let me cut out 80 acres I would let them have the remaining 100 acres for what I had tied up in it, * * * and we reached an arrangement on that basis.

"I figured I had in the property between $2,600.00 and $3,000.00 in the improvements besides the orchard. The orchard was just coming into the fourth year to bear, and was just coming into where it would begin to make me something like it ought to have. The year before I got around $2,200.00 off of it, that was in 1940. As to my investment in the orchard, I would consider about $2.00 a tree a very low price considering the cost of the trees, putting them out, and cultivating them for three years. I think $2.00 a tree would be a very conservative figure as to the value of the orchard at the time of the sale.

"I know the state of the orchard at the present time. I don't think there are many of the trees in the orchard living at this time. I attribute this to neglect. An orchard is like anything else, if you don't keep it up it is going to go down, and an orchard is more so that way than anything else, more than any other type of tree. It has to be cultivated if you are going to do anything with it. * * * and another thing, unless you cultivate the orchard properly and take care of it, the suckers will get on there, and if you don't have it sprayed like you ought to, the insects will get into it and kill the trees. It is necessary that the trees be sprayed all the time.

"I would not give anything for that orchard at the present time."

(The foregoing testimony is wholly without contradiction.)