STEPHEN MARCO MORRIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morris v. Commissioner
Docket No. 32983-85
United States Tax Court
T.C. Memo 1990-580; 1990 Tax Ct. Memo LEXIS 651; 60 T.C.M. (CCH) 1218; T.C.M. (RIA) 90580; November 13, 1990, Filed *651 Decision will be entered for the respondent. Stephen Marco Morris, pro se. Willie Fortenberry, for the respondent. WELLS, Judge. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions to Tax Under Sections Year
Deficiency [1] 6653(b) 6654
1978
$ 3,108.00 $ 1,554.00 $ 99.00   1979
$ 79,069.00
$ 39,535.00
$ 3,315.00
1980
$ 42,242.00
$ 21,121.00
$ 2,692.00
Respondent also determined that petitioner was liable for the self-employment tax provided by section 1401 during each of the years in issue. The issues to be decided are: (1) whether petitioner received unreported taxable income in the amounts determined by respondent for the years in issue; (2) whether petitioner is liable for the addition to tax for fraud; (3) whether petitioner is liable for the addition to tax for failure to make estimated payments of tax; and (4) whether petitioner is liable for self-employment tax for the years *652 in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. Petitioner resided in North Carolina at the time the petition in the instant case was filed. Petitioner graduated from Florida Technology University (now the University of Central Florida) in 1971, where he majored in history/pre-law. Prior to graduation, petitioner was arrested in April 1970 for possession of marijuana and was arrested in July 1970 for inciting to commit perjury. During such time, petitioner drove an older car and did not wear expensive clothes. In 1973, petitioner's father, K. A. Morris, gave petitioner a 1965 Ford Mustang. Petitioner also drove a Volkswagen. Petitioner was interested in guns; in the 1960's, he had developed a friendship with Madison (Max) Lankford, a gun dealer. From 1975 to 1983, petitioner lived with Sara Jane Sherer. In November 1975, petitioner was arrested for possession and sale or delivery of heroin, as well as for carrying a concealed firearm. He was found guilty by a jury on the possession and sale counts, but adjudication was withheld, and the court *653 ordered two years of probation. In December 1976, petitioner purchased a 1977 Lincoln Mark V for $ 14,694, trading a 1976 Buick Park Avenue and paying the $ 6,489 balance in cash. In June 1977, petitioner borrowed $ 5,000 from the Southeast Bank of New Symrna Beach, Florida, using the Lincoln as collateral. As of December 31, 1977, the unpaid balance of the loan was $ 3,024.64. All loan payments were made in cash. Prior to the years in issue, Sara Jane Sherer owned a 1976 Chevrolet Corvette, which was encumbered by a debt. Prior to the years in issue, the Corvette was sold to Sara Jane Sherer's brother, and the debt was paid off. Petitioner held no job from 1975 through 1980. Although petitioner filed Federal income tax returns for taxable years prior to 1973, in which he reported modest amounts of income, petitioner filed no such returns for the years 1973 through 1987, inclusive. Around 1977, petitioner began purchasing Rolex watches from Ned John Meis. Petitioner also purchased two guns from Mr. Meis in 1980. Petitioner ordered watches, some of which were customized with diamond-studded faces, from Mr. Meis. Petitioner did not make his purpose in purchasing the watches clear *654 to Mr. Meis. It seemed to Mr. Meis, however, that petitioner purchased the watches for resale, although he believed one or two of the watches were for petitioner's own use. Nearly all of the payments for the watches were made by cashier's checks drawn for less than $ 10,000. Petitioner once, however, paid Mr. Meis $ 6,500 cash for a watch or a gun. Payment generally was made before delivery of the watch, although sometimes the watch was sent first. Petitioner used cashier's checks extensively in his business dealings, but he could not recall ever drawing one for more than $ 10,000. During the years in issue, petitioner paid Mr. Meis $ 83,600 for watches and guns. Petitioner and Mr. Meis continued to do business until 1981 or 1982. Petitioner also obtained watches from Mr. Meis to be sold through Mr. Lankford's shop. Mr. Lankford and Mr. Meis did not deal with each other directly; merchandise and payments were transmitted through petitioner. Mr. Lankford could not afford to pay for the watches in advance; instead he transmitted the proceeds of the sale to petitioner in cash, regardless of whether the buyer paid by cash or check. Mr. Lankford stated that he remitted the sale *655 proceeds to petitioner in cash because "[dealing in Rolex watches was] a cash-type business." Mr. Lankford was unaware of petitioner's payment arrangements with Mr. Meis. Mr. Lankford claimed to have records of his watch dealings, but he did not produce any such records during respondent's investigation or at trial. Petitioner also was involved in purchases and sales of real estate during the years in issue. In 1979, William Smiley sold houses which Ludlow Florida Corporation (Ludlow) had built in a subdivision called "A Quiet Place in the Country." One of the houses was located at 430 Country Circle Drive (430 Country Circle). Petitioner and Sara Jane Sherer visited 430 Country Circle while Mr. Smiley was holding it open. Petitioner told Mr. Smiley that he wished to purchase 430 Country Circle, and Mr. Smiley put him in contact with Ludlow's general manager, Mr. John Irwin. Petitioner handled all negotiations concerning the purchase of 430 Country Circle with Mr. Irwin. Petitioner and Mr. Irwin settled on a purchase price of $ 124,000 for 430 Country Circle. The terms of the sale called for a $ 40,000 down payment and assumption of an $ 84,000 mortgage, which called for monthly *656 payments of $ 715.59. The $ 40,000 obligation was paid with four cashier's checks of $ 7,500 each, a personal check for $ 2,000 drawn on an account in the name of Sara Jane Sherer, and $ 8,000 of currency in $ 100 denominations. The cashier's checks showed K. A. Morris and L. D. Sherer, Sara Jane Sherer's father, as remitters, but the funds represented by the checks did not come from them. Petitioner initially tried to qualify for the mortgage, but he could not qualify because he had no job and no verifiable income. Both Mr. Smiley and Mr. Irwin attempted to persuade the bank to let petitioner assume the mortgage, but were not successful. Petitioner became irritated at his inability to qualify for the mortgage. Petitioner insisted that he had the required income or funds and one evening came to Mr. Smiley's house with a paper bag full of $ 100 bills to prove his assertion. Petitioner asked Mr. Smiley to count the money. Although Mr. Smiley declined to count the money, he believed that the bag contained more money than he ever had seen collectively. After failing to qualify for the mortgage, petitioner considered putting 430 Country Circle in his father's name. In the end, however, *657 Sara Jane Sherer was listed as the buyer. Sara Jane Sherer filled out and signed a mortgage application. The mortgage application listed an unidentified co-borrower with an annual income of " $ 75,000+." During the years in issue, Sara Jane Sherer's adjusted gross income, as reported on her Federal income tax returns, was $ 5,379.00 in 1978, $ 1,779.87 in 1979, and $ 1,304.61 in 1980. From May 1978 until February 1979, she was employed as an interior designer by Bellemead Development Corporation, which paid her $ 4.55 per hour for her services. Sara Jane Sherer did not hold gainful employment for the remainder of 1979, and she was unemployed until September 1980, when she began work as a real estate associate. She did not, however, receive any remuneration from her employment in 1980. Sara Jane Sherer's adjusted gross income for 1981 was $ 4,143.70. After the purchase of 430 Country Circle, Mr. Irwin and petitioner discussed other properties Ludlow had for sale in the subdivision. Mr. Irwin and petitioner negotiated the sale of lot 99, which adjoined 430 Country Circle, for $ 14,500 cash. Mr. Irwin did not deal with K. A. Morris prior to the sale; K. A. Morris, however, signed *658 the sales contract, dated February 29, 1980, for lot 99 and was listed as its owner on the deed, which was dated April 8, 1980. Mr. Irwin and petitioner also negotiated the sale of a house at 410 Country Circle Drive (410 Country Circle) in the "A Quiet Place in the Country" subdivision for $ 100,000. Mr. Irwin did not meet K. A. Morris during the negotiation process. Again, K. A. Morris signed the sales contract, dated April 1, 1980, and the property was recorded in his name. At the time of such transactions, K. A. Morris worked at a space center in Florida and was near retirement. In summer 1980, petitioner met James and Myrtice Peacock, who recently had acquired an automobile dealership in the area and were interested in buying a home. While driving through the subdivision one day, the Peacocks stopped to inspect 410 Country Circle, which was vacant. Petitioner was next door inspecting the ruins of 430 Country Circle, which recently had burned to the ground. Petitioner came over to 410 Country Circle and showed them the house. He then opened negotiations with the Peacocks for the sale of 410 Country Circle. Sara Jane Sherer, who was also present, admired the 1980 Dodge Mirada *659 which Mr. Peacock was driving that day. Petitioner and Mr. Peacock subsequently made a deal to sell 410 Country Circle for $ 118,828, using the automobile, valued at $ 10,828, as the down payment on the house and financing the remainder by assumption of the existing mortgage on the property and by giving K. A. Morris a second mortgage. Mr. Peacock dealt with petitioner in arranging the sale, although he saw K. A. Morris prior to the closing at a meeting in an attorney's office, at which petitioner also was present. K. A. Morris appeared at the closing in September 1980 to sign the sales contract for 410 Country Circle. After the closing, Sara Jane Sherer picked up the 1980 Dodge Mirada from Mr. Peacock's dealership; the car was titled in her name. During the years in issue, petitioner was involved in the acquisition of other automobiles. In 1978, petitioner purchased a 1977 Ford van for $ 1,250, which petitioner sold to his brother, Philip Morris, in 1980. In January 1979, petitioner purchased a 1979 Chevrolet Corvette in the name of Sara Jane Sherer for $ 12,935.38. Payment for the car consisted of $ 6,000 in checks and $ 6,935.38 in cash. A loan of $ 7,000, secured by the *660 car, was made by Flagship First National Bank in February 1979. Monthly payments of $ 192.39 were made on the note until October 1980, when the note was paid off. Payment of the loan coincided with the sale of the car to Wayne Rogers for $ 10,750. A loss of $ 2,185.38 was sustained in 1980 on the sale of the 1979 Corvette. Also during 1979, petitioner purchased a 1976 GMC motor home from Ralph Miller for $ 20,000 in cash; the payment consisted of $ 20 bills, delivered in a brown paper bag. In 1980, petitioner resold the motor home to Mr. Miller for $ 15,000. Petitioner sustained a loss of $ 5,000 on the sale of the motor home. In June 1979, petitioner traded his 1977 Lincoln for a 1979 Cadillac Eldorado that had a purchase price of $ 17,457.75. The dealer gave a trade-in allowance of $ 9,584 for the Lincoln, and the balance of $ 8,188.70 was paid in cash. Petitioner sustained a loss of $ 5,110 on the trade of the Lincoln. In September 1979, petitioner purchased a 1979 Dodge van for $ 6,345 in cash. During the years in issue, bank accounts were maintained in the names of petitioner and Sara Jane Sherer. Year-end balances of such bank accounts were as follows: Year-End Balances (as of December 31) Bank, Account
Number, and Name
1977
1978
1979
1980
Flagship First
National Bank
#0287091
Sara Jane Sherer
$ 40.95 $ 652.40  $ 2.10      --  Florida Bank
and Trust Co.
#81-0464-8
Sara Jane Sherer
--
$ 25.86   $ (315.81)  $ 5.32 Security First
Federal Savings
and Loan
#591466370
Sara Jane Sherer
--
--
$ 15,140.42 $ 76.04
Heritage Federal
Savings and Loan
#03-23-01140-8
Sara Jane Sherer
--
$ 3,145.33
$ 11,462.69 $ 97.38
Southeast Bank
of New Symrna
#73-41-3207-9
Stephen M. Morris
--
$ 7.43    $ (32.64)   $ 6.03 Sara *661 Jane Sherer made several cash deposits of amounts ranging between $ 1,000 and $ 5,000 into the accounts at Security First Federal Savings and Loan and Heritage Federal Savings and Loan during 1979 and 1980. In March 1979, an account in the name of Sara Jane Sherer was opened with the brokerage house of Raymond James & Associates, Inc. (Raymond James). On the account form, Sara Jane Sherer represented that she was self-employed and had an annual income of $ 10,000. Initially, small amounts of stock were purchased for the account, but, on November 14, 1979, payments of $ 5,000 and $ 7,000 were made into the account, which amounts were used to purchase shares in the INA Cash Fund. On December 31, 1979, the value of the INA holdings in Sara Jane Sherer's name was $ 12,198.34. During each year in issue, petitioner maintained show dogs. Petitioner purchased the dogs for hundreds of dollars each from breeders. He entered the dogs in shows, engaged professionals to handle, board, train, and show them, and even had them photographed professionally. Petitioner paid many of the expenses associated with his dog activities by cashier's checks. During the years in issue, petitioner expended *662 $ 14,473.25 on his show dog activities. During the years in issue, petitioner received income from his show dog activities in the form of prizes and stud fees. Petitioner gambled during the years in issue, frequenting dog races and a jai-alai fronton, to which he held a special pass entitling him to free admission. Information reports issued by race tracks in 1978 and 1980 showed that petitioner won $ 3,892.90 from such gambling. Petitioner engaged in a number of miscellaneous transactions during the years in issue: he paid legal fees of $ 2,500 in 1978; he paid Shaw Harrison $ 3,000 in 1979; he paid $ 1,500 for the installation of a water cooled heat pump in 1980; and he purchased an Ithaca shotgun from Mr. Scott for $ 925 in 1980. In 1979, Clyde Hart, a longtime friend, loaned petitioner $ 5,000. In 1980, respondent commenced a criminal investigation of petitioner. In July 1980, respondent's agents visited petitioner and sought to interview him, but he declined to speak with them. Respondent's agents checked petitioner's income tax return filing history. Respondent's agents interviewed petitioner's friends, relatives, business associates, and others who might have had useful *663 information about him. They issued summonses to persons who had business dealings with petitioner, requiring those persons to produce records documenting transactions with petitioner. Certain persons claimed that petitioner sold watches; respondent's agents attempted to identify persons to whom petitioner may have sold watches, but they could find no evidence of such sales. Various witnesses also stated that petitioner owned a gun collection, but they provided no specific information which would have enabled respondent's agents to identify the guns, to establish the amount paid for them, or to ascertain the date of their purchase. Petitioner furnished no information concerning a gun collection to respondent's agents. Respondent's agents followed up the leads they received and attempted to document petitioner's weapons dealings, but they only obtained information concerning purchases of two guns from Mr. Meis and of one from Mr. Scott. Respondent reconstructed petitioner's income for the years in issue by means of the net worth and cash expenditures methods. Respondent's agents investigated the leads to assets produced by their inquiries, but only property for which the date of *664 acquisition and cost could be verified were included in respondent's calculation of petitioner's net worth. In developing the net worth statement, respondent's agents considered all assets disclosed by their investigation, including automobiles, real property, bank accounts, stock accounts, mortgage receivables, and property in the names of Sara Jane Sherer and K. A. Morris. Respondent's agents also took into account the liabilities associated with such assets. Respondent's agents made a second attempt to contact petitioner in July 1982. A letter inviting petitioner to explain his position and to provide pertinent information with respect to his tax liability for the years in issue was sent by certified mail to four different addresses. The letters, however, were returned to respondent with a Post Office notation that delivery had been refused. Based on the investigation, respondent determined petitioner's net worth and personal expenditures as follows: Years Ending December 31
1977
1978
1979 1980 Assets
$ 14,734.95 $ 19,775.02 $ 225,384.97 $ 221,672.82 Liabilities
$ (3,024.64)
$ (-0-)     $ (94,945.38)
$ (88,420.97)
Net Worth
$ 11,710.31 $ 19,775.02 $ 130,439.59 $ 133,251.85 Increase in
Net Worth
N/A $ 8,064.71  $ 110,664.57 $ 2,811.72   Other
Expenditures
(net of non-
deductible losses)
N/A $ 5,303.50  $ 29,373.50  $ 83,616.63  Adjusted Gross
Income (rounded)
$ 13,368.00 $ 140,038.00 $ 86,428.00  Deficiency
$ 3,108.00  $ 79,069.00  $ 42,242.00  *665 In March 1982, petitioner purchased 250 pounds of marijuana from undercover agents of the Orlando, Florida, police, and he was arrested for trafficking in cannabis and the unlawful possession of a concealed firearm. After a jury convicted him of the drug trafficking charges, petitioner was sentenced to a 20 year term of imprisonment and was fined $ 26,250. On April 1, 1985, respondent made a jeopardy assessment against petitioner in the amount of $ 291,525.80. By order entered July 25, 1985, the United States District Court for the Eastern District of North Carolina ruled that both the jeopardy assessment against petitioner and its amount were reasonable. Pursuant to such assessment, respondent levied on the mortgage on 410 Country Circle and on lot 99, both of which were held in the name of K. A. Morris. K. A. Morris challenged the levy, but was unsuccessful both in the trial court and in the appellate court. See Morris v. United States, 652 F. Supp. 120 (M.D. Fla. 1986), affd. 813 F.2d 343 (11th Cir. 1987). OPINION The Deficiency
Respondent determined deficiencies in petitioner's Federal income tax for the years in issue by means of the net worth and personal (cash) expenditures *666 methods. The net worth method is an accepted means of proving income, Holland v. United States, 348 U.S. 121 (1954); Cefalu v. Commissioner, 276 F.2d 122 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Lias v. Commissioner, 235 F.2d 879, 880 (4th Cir. 1956), affg. 24 T.C. 280 (1955), cert. denied 353 U.S. 935 (1957), as is the cash expenditures method. United States v. Johnson, 319 U.S. 503, 517-518 (1943); United States v. Penosi, 452 F.2d 217 (5th Cir. 1971), cert. denied 405 U.S. 1065 (1972); DeVenney v. Commissioner, 85 T.C. 927, 930 (1985); Cohen v. Commissioner, 9 T.C. 1156, 1162-63 (1947), affd. 176 F.2d 394 (10th Cir. 1949). Petitioner's failure to maintain adequate [2] *667 records, as required by section 6001, warrants the use of such methods in the instant case. Goodmon v. Commissioner, 761 F.2d 1522, 1524 (11th Cir. 1985), affg. a Memorandum Opinion of this Court; Petzoldt v. Commissioner, 92 T.C. 661, 687, 693 (1989); Cupp v. Commissioner, 65 T.C. 68, 82 (1975), affd. by unpublished opinion 559 F.2d 1207 (3d Cir. 1977); Estate of Beck v. Commissioner, 56 T.C. 297, 353-354 (1971). Deficiencies determined by indirect means of proof are presumed correct, Webb v. Commissioner, 394 F.2d 366, 372 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Mills v. Commissioner, 399 F.2d 744, 749 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; Cefalu v. Commissioner, 276 F.2d 122, 126 (5th Cir. 1960); O'Dwyer v. Commissioner, 266 F.2d 575, 588 (4th Cir. 1959), affg. 28 T.C. 698 (1957), cert. denied 361 U.S. 862 (1959); Bryan v. Commissioner, 209 F.2d 822, 825 (5th Cir. 1954), affg. a Memorandum Opinion of this Court, cert. denied 348 U.S. 912 (1955), and petitioner bears the burden of proving them erroneous. Parks v. Commissioner, 94 T.C. 654, 658-659 (1990); Rule 142(a). We have held that the requirements set forth in Holland v. United States, 348 U.S. 121 (1954), are applicable to deficiencies determined by means of the net worth and expenditures methods. Petzoldt v. Commissioner, 92 T.C. at 694. Petitioner *668 may carry his burden of proof by demonstrating respondent failed to (1) establish opening net worth with reasonable certainty, [3] (2) show a likely source of taxable income or negate nontaxable sources of income, or (3) follow up leads to nontaxable sources provided by petitioner. Holland v. United States, 348 U.S. 132-138. In other words, petitioner "must prove either that someone else made the expenditures, or that the funds used were obtained from nontaxable sources, e.g., loans, gifts, inheritances, or assets on hand at the beginning of the taxable period." DeVenney v. Commissioner, 85 T.C. at 931. Petitioner, however, has failed to carry his burden of proof. Petitioner first attacked respondent's opening net worth figure, asserting that respondent failed to include in petitioner's opening net worth an *669 alleged gun collection, which petitioner claimed provided the source of many of the expenditures included in respondent's calculations. Petitioner, however, never furnished information concerning the alleged gun collection to respondent's agents, even though respondent's agents gave him opportunities to discuss the matter with them. Furthermore, petitioner maintained no records concerning such guns, their cost of acquisition, or of the proceeds of their sale. At trial, petitioner called two of his friends and his brother to testify in support of his claim. Their testimony, however, was too vague and general to establish either the cost or time of acquisition of the alleged gun collection. Moreover, the record shows that petitioner had not accumulated extensive assets prior to the years in issue, and we find it difficult to believe that his resources would have permitted him to accumulate a gun collection with sufficient value to fund his substantial expenditures during the years in issue. Nicholas v. Commissioner, 70 T.C. 1057, 1065 (1978). Accordingly, petitioner has not established that a gun collection should have been included in his opening net worth. Bond v. Commissioner, 232 F.2d 822, 825-826 (4th Cir. 1956), *670 affg. a Memorandum Opinion of this Court, cert. denied 352 U.S. 878 (1956). Inasmuch as petitioner failed to maintain adequate records concerning his assets and income, he is not in a position to be hypercritical of respondent's labors. Webb v. Commissioner, 394 F.2d at 372. "Nor should he be overly chagrined at [our] reluctance to credit every word of his negative wails." Webb v. Commissioner, 394 F.2d at 373. Petitioner also attempted to show that the net worth increases attributed to him by respondent properly were not taxable to him. Petitioner made several suggestions of nontaxable sources for his expenditures, but he offered no credible, independent support for any of his claims. We have considered each such contention, but are not persuaded that any such sources existed. As to such sources, petitioner claimed that he had borrowed money during the years in issue, and, in support of his claims, attached to his petition affidavits from purported lenders. Such affidavits, however, are not competent evidence. Rule 143(b); Rule 802, Federal Rules of Evidence. Petitioner's brother, Philip Morris, testified at trial that petitioner had borrowed money, but he had no personal knowledge *671 of any such loans, other than one involving a lender who was dead at the time of trial. We therefore do not credit the testimony of petitioner's brother. Petitioner's friend and employer, Clyde Hart, whose business affairs involve real estate and racetrack operations, testified that he had loaned $ 20,000 to petitioner's girlfriend, Sara Jane Sherer, but he stated that no interest was payable on the loan, that no security was given, that repayment would occur "whenever she paid [him] back," and that he had lost all his records relating to the loan. That an experienced businessman such as Mr. Hart would lend such a substantial amount of money in so casual a fashion is incredible, and accordingly we do not credit Mr. Hart's testimony. Consequently, we find that petitioner received no loans during the years in issue, other than one for $ 5,000, to which the parties have stipulated. Petitioner also claimed that the funds used to purchase the various assets acquired during the years in issue were not his, and that he acted merely as an agent or conduit between the seller and the true buyer. Petitioner's version of events is not corroborated by the other facts in the record; furthermore, *672 we are not bound to accept his self-serving testimony as gospel. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Pascarelli v. Commissioner, 55 T.C. 1082, 1095 (1971), affd. without published opinion 485 F.2d 681 (3d Cir. 1973). With respect to the purchase of 430 Country Circle, petitioner conducted all negotiations with Ludlow and Mr. Irwin. In an attempt to demonstrate his financial resources and to qualify for a mortgage on the property, petitioner exhibited a paper bag full of $ 100 bills to the realtor handling the sale. Furthermore, petitioner considered placing the house in his father's name before deciding to title it in the name of his girlfriend, Sara Jane Sherer. Petitioner claimed that Sara Jane Sherer was the source of one half of the $ 40,000 down payment that was made incident to the purchase of 430 Country Circle. Sara Jane Sherer, however, had no job at the time of the purchase, and her tax returns reveal only meager amounts of income during the years in issue. Such circumstances support the inference that petitioner was in fact the source of the funds for the purchase and that the property properly was included in his net worth. See United States v. Costanzo, 581 F.2d 28, 34 (2d Cir. 1978), *673 cert. denied 439 U.S. 1067 (1979). Furthermore, petitioner did not call Sara Jane Sherer as a witness at trial, claiming ignorance of her whereabouts. Her father, L. D. Sherer, however, did appear at trial, but petitioner did not see fit to question Mr. Sherer about the inheritances and gifts which petitioner alleged were the sources of Sara Jane Sherer's wealth. Such failure is especially significant in view of the fact that Mr. Sherer was the only witness at trial who could support petitioner's claim that Sara Jane Sherer purchased the assets held in her name with her own funds, and that the money deposited in the bank and stock accounts was hers, rather than petitioner's. Petitioner also contended that his father, K. A. Morris, was the actual purchaser of 410 Country Circle and Lot 99. The record, however, shows that petitioner handled all the negotiations connected with the purchase of the properties from Ludlow and Mr. Irwin, while K. A. Morris only appeared at the closing to sign the papers. With respect to the sale of 410 Country Circle to the Peacocks, petitioner offered a tortured story involving a three-way trade he arranged between Mr. Peacock, his father, and Sara Jane *674 Sherer. We find petitioner's version of events to be implausible and not supported by independent evidence in the record, which shows that petitioner arranged the sale terms in conformity with his own desires. Especially noteworthy is the fact that petitioner did not call K. A. Morris to testify at trial. Petitioner also maintained that he was not the source of the funds for the Rolex watch purchases documented during the years at issue, that he was merely an agent who transmitted the watches and payments between seller and buyer, and that he incurred losses on the sales. Again, we are not obliged to accept petitioner's testimony at face value, even where it is uncontroverted, if it is improbable, unreasonable, or questionable. Quock Ting v. United States, 140 U.S. 417 (1891); Factor v. Commissioner, 281 F.2d 100, 111 (9th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 364 U.S. 933 (1961); Archer v. Commissioner, 227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court. At trial, Mr. Meis testified that the usual course of dealing was for petitioner *675 to make payment before the watches were mailed. Such testimony suggests that petitioner was the source of the funds for the purchase of the watches, as it is unlikely that a prudent buyer would pay for such an expensive item sight unseen, especially when the watch was acquired in such an unconventional fashion. Petitioner also stated that he made little or no profit on the sales, but there is nothing in the record to suggest that petitioner would have participated in a commercial transaction of such nature for philanthropic reasons, expecting no profit for his efforts. Petzoldt v. Commissioner, 92 T.C. 661, 697 (1989). At trial, petitioner mentioned the names of several persons to whom he claimed to have sold watches; however, once again, none of these persons were called to testify in support of petitioner's version of events. Petitioner also claimed that his expenditures during the years in issue were financed by sales of his gun collection. Such sales, however, would have produced taxable gain to the extent the amount realized exceeded petitioner's basis in the guns. Secs. 61(a)(3); 1001(a). Petitioner bears the burden of establishing the basis of property sold or exchanged. *676 Winer v. Commissioner, 371 F.2d 684, 687 n.5 (1st Cir. 1967), affg. a Memorandum Opinion of this Court; S. & B. Realty Co. v. Commissioner, 54 T.C. 863, 873 (1970); Rule 142(a). Petitioner, however, made no claim of any basis in the guns, and so none can be taken into account for tax purposes. Bennett v. Commissioner, 139 F.2d 961, 965 (8th Cir. 1944), affg. a Memorandum Opinion of this Court; Camp Wolters Land Co. v. Commissioner, 5 T.C. 336, 349-350 (1945), affd. on this issue 160 F.2d 84 (5th Cir. 1947). [4] Therefore, even if petitioner's transactions during the years in issue were financed by the proceeds of gun sales, the proceeds of such sales do not constitute a nontaxable source of funds. Based on the foregoing, we find that petitioner has not carried his burden of showing error in respondent's determination. Accordingly, we sustain respondent's determination of deficiencies for the years in issue. Addition to Tax for Fraud
Respondent determined that petitioner's understatements of tax for the years in issue were due to fraud and accordingly *677 imposed the addition to tax provided under section 6653(b). The addition to tax for fraud is a civil sanction provided primarily for the protection of the revenue and to reimburse respondent for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938); Brooks v. Commissioner, 82 T.C. 413, 430-431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Respondent's determination with respect to fraud, however, enjoys no presumption of correctness, but must be proven by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Respondent has the burden of proving that some underpayment of tax occurred in each year in issue, and that some portion of each such underpayment was due to fraud. Petzoldt v. Commissioner, 92 T.C. at 699. To meet the first prong of the test, respondent may not rely simply upon petitioner's failure to carry the burden of showing error in the determination of the deficiencies. Petzoldt v. Commissioner, 92 T.C. at 700; Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). 1. Underpayments of Tax As noted above, respondent relies upon the net worth and personal (cash) expenditures *678 methods to demonstrate that underpayments of tax occurred during the years in issue. In order to establish the receipt of taxable income under the net worth method, however, the Commissioner must show that he has observed the guidelines laid down in Holland v. United States, 348 U.S. 121 (1954). See Smith v. Commissioner, 91 T.C. 1049, 1059 (1988); Brooks v. Commissioner, 82 T.C. at 431-432. The requirements of Holland also generally are applicable to the determination of taxable income under the cash expenditures method. Hoffman v. Commissioner, 298 F.2d 784, 786-87 (3rd Cir. 1962), affg. a Memorandum Opinion of this Court. Where the safeguards set out in Holland are satisfied, net worth increases and expenditures are prima facie proof of taxable income. Holland v. United States, 348 U.S. at 138-39; Manzoli v. Commissioner, 904 F.2d 101, 104 (1st Cir. 1990), affg. a Memorandum Opinion of this Court. See also Lipsitz v. Commissioner, 21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir.), cert. denied 350 U.S. 845 (1955). Under Holland, the taxpayer's opening net worth must be established with reasonable certainty, so that it will serve as a reliable starting point for measuring *679 increases in the taxpayer's net worth. Holland v. United States, 348 U.S. at 132; Davis v. Commissioner, 249 F.2d 69, 70 (4th Cir. 1957), affg. a Memorandum Opinion of this Court. While such requirement is applicable where the cash expenditures method is used, United States v. Penosi, 452 F.2d 217, 219 (5th Cir. 1971), cert. denied 405 U.S. 1065 (1972), the "reasonable certainty" test may be satisfied without a precise determination of opening net worth "as long as the proof * * * makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures." Petzoldt v. Commissioner, 92 T.C. at 695, quoting Taglianetti v. United States, 398 F.2d 558, 565 (1st Cir. 1968), affd. per curiam 394 U.S. 316 (1969). Moreover, the Commissioner must introduce evidence to support the inference that increases in the taxpayer's net worth during the years in issue are funded by currently taxable income. He may provide support for such an inference by showing a likely source of taxable income or by negating nontaxable sources. Holland v. United States, 348 U.S. at 137-138 (net worth method); United States v. Penosi, 452 F.2d at 219-220 *680 (expenditures method). If all nontaxable sources of income are negated, a likely source of taxable income need not be shown. United States v. Massei, 355 U.S. 595 (1958). "One or the other will do." Petzoldt v. Commissioner, 92 T.C. at 696. The Commissioner must follow up leads to nontaxable sources furnished by the taxpayer, where they are reasonably susceptible of being checked, in order to overcome the taxpayer's contention that net worth increases during the years at issue did not come from taxable income. Holland v. United States, 348 U.S. at 135-136, 138; United States v. Mancuso, 378 F.2d 612, 617 (4th Cir. 1967), cert. denied 390 U.S. 955 (1968). Where, however, the taxpayer provides no such leads, the Commissioner is not required to negate every possible nontaxable source of income, a matter peculiarly within the knowledge of the taxpayer. Holland v. United States, 348 U.S. at 138; United States v. Penosi, 452 F.2d at 220. See also Meier v. Commissioner, 91 T.C. 273, 296-97 (1988) (taxpayer must provide an explanation of the source of his expenditures before the investigative requirements of Holland are triggered). Information on nontaxable income should be supplied by *681 the taxpayer. United States v. Goldstein, 685 F.2d 179, 182 (7th Cir. 1982). Based on our examination of the record in the instant case, we find that respondent has satisfied all conditions necessary to demonstrate petitioner's receipt of taxable income under the net worth and expenditures methods during the years in issue. The record shows that respondent's determination is the result of a diligent search for assets and represents an earnest effort to ascertain petitioner's financial status and taxable income during the years in issue. Beard v. United States, 222 F.2d 84, 89 (4th Cir. 1955), cert. denied 350 U.S. 846 (1955). We find that respondent established petitioner's opening net worth with reasonable certainty. Respondent diligently sought to identify petitioner's assets and to determine both their date and cost of acquisition. Because petitioner provided no assistance, respondent's agents calculated petitioner's opening net worth on the basis of an extensive series of interviews with his family, friends, and business associates, as well as upon a review of available records pertaining to petitioner's financial and business dealings. Respondent's investigation showed that, *682 prior to the years in issue, petitioner was not prosperous and did not have many assets. Respondent, however, included in petitioner's opening net worth all assets for which the cost and date of acquisition could be documented. Those assets were the 1977 Lincoln Mark V, a 1965 Ford Mustang, and a bank account with a year-end balance of $ 40.95. The record contains no other evidence that shows petitioner possessed any other assets at the beginning of the years in issue. We note that respondent listed in petitioner's opening net worth the 1965 Mustang given him by his father in 1973, but respondent did not take the cost or any other assignment of value of that automobile into account in arriving at the opening net worth figure. Respondent, however, treated petitioner as continuing to own such automobile during all the years in issue; such treatment is consistent with the record in the instant case, which does not show that the Mustang was either disposed or converted into any other asset included in the net worth calculation during the years in issue. Generally, courts have rejected net worth increases as proof of income where the exclusion of assets from opening net worth is "arbitrary *683 and unreasonable," Fuller v. Commissioner, 313 F.2d 73, 76 (6th Cir. 1963), affg. in part, modifying and remg. a Memorandum Opinion of this Court, or where credible evidence concerning assets is disregarded for no reason. United States v. Bethea, 537 F.2d 1187, 1189-1190 (4th Cir. 1976). We find that the exclusion of the 1965 Mustang from the opening net worth calculation was not arbitrary, and that the exclusion of the automobile did not vitiate the accuracy or reliability of the opening net worth. The record does not show the automobile's cost, and so it was reasonable for respondent not to include such a figure in his calculation. Even if some value had been assigned to the automobile, the inclusion of the automobile would have had no effect on the net worth increases determined because no transactions involving the automobile occurred during the years in issue. We further find that respondent properly excluded petitioner's alleged gun collection from opening net worth. Although respondent obtained no leads from petitioner, respondent followed up on information he received concerning the alleged collection, but could obtain no documentation concerning the alleged collection. In *684 an effort to document sales of guns, respondent issued summonses to persons who had business dealings with petitioner, but respondent obtained only evidence of isolated purchases of guns by petitioner. Moreover, the witnesses questioned by respondent's agents gave nothing more than vague and general statements concerning the alleged gun collection. Such statements were of no value in establishing the cost or acquisition date of the guns. Accordingly, we find that respondent has satisfied the requirements of Holland with respect to petitioner's claim of a gun collection. Where petitioner supplies no leads, respondent is not required to embark on "Magellan-like expeditions," United States v. Hiett, 581 F.2d 1199, 1201 (5th Cir. 1978), to conduct an "exhaustive nationwide investigation," United States v. Penosi, 452 F.2d at 220, or to pursue "phantom clues as to some mysterious sources and assets," United States v. Hamilton, 620 F.2d 712, 715 (9th Cir. 1980), in order to overcome petitioner's claims. We further find that respondent has established a likely source for petitioner's expenditures and has negated nontaxable sources of income. The record shows that petitioner engaged in several *685 income-producing activities during the years in issue, which we may infer provided at least part of the funds for petitioner's expenditures. The record shows that petitioner derived taxable income from gambling, from prizes and stud fees attributable to his show dog activities, and from the sale of Rolex watches during the years in issue. While the sources identified likely do not account for all of petitioner's expenditures during the years in issue, respondent, having established a reliable opening net worth, may nonetheless create the inference that the funds for the expenditures in question were derived from taxable sources by negating nontaxable sources for such expenditures. United States v. Massei, 355 U.S. at 595. Where petitioner commits himself to one specific explanation of the source of nontaxable income, respondent may meet the requirements of Holland and Massei by negating that specific source. Gatling v. Commissioner, 286 F.2d 139, 144 (4th Cir. 1961), affg. a Memorandum Opinion of this Court. Respondent also may satisfy the Holland test by showing that his investigation revealed no sources of nontaxable income for the expenditures in question. United States v. Goldstein, 685 F.2d 179, 182 (7th Cir. 1982); *686 United States v. Costanzo, 581 F.2d 28, 30-31, 33-34 (2nd Cir. 1978), cert. denied 439 U.S. 1067 (1979); United States v. Penosi, 452 F.2d at 219-220. In the instant case, respondent's detailed and thorough investigation of petitioner's affairs revealed no nontaxable source for his expenditures. Moreover, the claims of nontaxable sources of income made by petitioner have been negated adequately by the evidence in the record. At trial, respondent showed the incredible nature of petitioner's claims that he had received loans from various persons and that he had acted merely as an agent for others with respect to the purchases and sales of property that occurred during the years in issue. Parks v. Commissioner, 94 T.C. 654, 661 (1990) (the Commissioner may disprove specific nontaxable sources alleged by the taxpayer by showing that his reconstruction of income is accurate and that the taxpayer's allegations are implausible). Furthermore, petitioner principally relied on his own self-serving testimony to support his claims. Even though respondent has the burden of proof as to fraud, "there comes a time when petitioner must come forward with evidence in support of his claimed defenses; *687 it is not enough merely to raise theoretical defenses in an attempt to create a reasonable doubt as to respondent's evidence." Brooks v. Commissioner, 82 T.C. 413, 433 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). [5] Petitioner has not come forward with any credible evidence in support of his claims. Based on the foregoing, we find that respondent has established, by clear and convincing evidence, that underpayments of tax occurred in each of the years in issue. 2. Fraud. A showing that income has been underreported, however, is, in itself, not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Gatling v. Commissioner, 286 F.2d at 145. Fraud may not be found under "circumstances which at most create only suspicion." Katz v. Commissioner, 90 T.C. 1130, 1144 (1988). In order to establish fraud, respondent must show, by clear and convincing evidence, that petitioner intended to evade taxes believed to be owing by conduct designed to conceal, mislead, or otherwise prevent to collection of taxes. Korecky v. Commissioner, 781 F.2d 1566 (11th Cir. 1986), *688 affg. a Memorandum Opinion of this Court; Moore v. United States, 360 F.2d 353, 355 (4th Cir. 1965), cert. denied 385 U.S. 1001 (1967); Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). The existence of fraud is a question of fact and is to be resolved on the basis of the entire record. Petzoldt v. Commissioner, 92 T.C. at 699; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Because direct evidence of a petitioner's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts. Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue a Memorandum Opinion of this Court; Meier v. Commissioner, 91 T.C. 273, 297 (1988); Stephenson v. Commissioner, 79 T.C. 995, 1005-06 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Petitioner's entire course of conduct may establish the requisite fraudulent intent. Korecky v. Commissioner, 781 F.2d at 1568; Petzoldt v. Commissioner, 92 T.C. at 699. Such intent may be inferred from any conduct, the likely effect of which would be to conceal, mislead, *689 or otherwise prevent the collection of taxes believed to be owing. Spies v. United States, 317 U.S. 492, 499 (1943). Courts have relied upon a number of indicia or badges in deciding whether to sustain respondent's determinations with respect to the addition to tax for fraud. Proof of consistent and substantial understatements of income over a period of years may constitute convincing evidence of fraud, Holland v. United States, 348 U.S. 121, 139 (1954), especially when supported by other circumstances pointing toward an intention to evade taxation. Foster v. Commissioner, 391 F.2d at 733; Gatling v. Commissioner, 286 F.2d at 145. Failure to file tax returns, when coupled with other indicia of fraud, also may be considered evidence of an intent to evade or defeat the payment of tax. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Recklitis v. Commissioner, 91 T.C. at 911; Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). Failure to maintain complete and accurate records evinces a fraudulent intent. Bradford v. Commissioner, 796 F.2d at 307; Korecky v. Commissioner, 781 F.2d at 1568; Bond v. Commissioner, 232 F.2d 822, 826 *690 (4th Cir.), affg. a Memorandum Opinion of this Court, cert. denied 352 U.S. 878 (1956); Harper v. Commissioner, 54 T.C. 1121, 1141-1142 (1970) (holding that, while failure to produce records in course of criminal investigation should not be held against a taxpayer, failure to maintain such records is evidence of fraud). Attempting to conceal assets is another badge of fraud. Foster v. Commissioner, 391 F.2d at 733; Lipsitz v. Commissioner, 220 F.2d 871, 875 (4th Cir. 1955), affg. 21 T.C. 917 (1954), cert. denied 350 U.S. 845 (1955). Concealment demonstrating an intent to evade may be shown where petitioner places assets in the names of others. United States v. Calles, 482 F.2d 1155, 1160 (5th Cir. 1973); Foster v. Commissioner, 391 F.2d at 733; Lipsitz v. Commissioner, 220 F.2d at 875; Chinn v. United States, 228 F.2d 151, 154 (4th Cir. 1955). Such concealment may also be shown by a pattern of dealing in cash, Bradford v. Commissioner, 796 F.2d at 308; Nicholas v. Commissioner, 70 T.C. 1057, 1066 (1978), or of using cashier's checks in amounts under $ 10,000, for which Currency Transaction Reports need not be filed. Parks v. Commissioner, 94 T.C. 654, 665 (1990)
The record in the *691 instant case contains ample evidence of petitioner's fraudulent evasion of Federal income taxes. Petitioner is a college graduate and filed Federal income tax returns until 1973, indicating that he was aware of his obligation to file and pay tax. Goodmon v. Commissioner, 761 F.2d 1522, 1524 (11th Cir. 1985), affg. a Memorandum Opinion of this Court; Grosshandler v. Commissioner, 75 T.C. at 19-20. Petitioner received substantial amounts of taxable income during the years in issue, and he filed no returns for such years. Furthermore, petitioner did not file returns for the 15-year period beginning with taxable year 1973. Respondent accordingly has shown a consistent pattern of underreporting and of failure to file returns. While such failure to file standing alone is not sufficient to establish fraud, it is cogent evidence of fraud when coupled with other circumstances in the record. Kotmair v. Commissioner, 86 T.C. 1253, 1260-1261 (1986). Petitioner failed to maintain any records that would enable the determination of his taxable income. Such failure is a badge of fraud. Furthermore, the record shows that petitioner attempted to conceal his income by placing assets, such as automobiles, *692 real estate, and bank and brokerage accounts, in the names of his girlfriend and father during each year in issue. The evidence shows that petitioner handled all of the negotiations incident to the purchase and sale of the real estate held by his nominees, and that the record owners merely appeared at the close of each transaction to sign documents. Furthermore, we are satisfied that Sara Jane Sherer and K. A. Morris did not have the financial resources to purchase such assets, and that petitioner was the source of the funds for the property held in their names. For instance, in January 1979, a new Chevrolet Corvette was purchased in Sara Jane Sherer's name; the purchase price of $ 12,935.38 was paid on delivery by cash and checks. A $ 7,000 loan, secured by the car, was obtained in February 1979, and regular monthly payments of $ 192.39 were made on the debt until October 1980. Sara Jane Sherer, however, left her job in the same month that such obligation was incurred, and she received no compensation from employment before the end of 1980. During the years in issue, she had no source of income adequate to fund either the purchase of the car or the payment of the debt, and her *693 behavior indicates that she did not depend on her own resources to do either. The record also reveals that petitioner repeatedly used cash and cashier's checks for amounts of less than $ 10,000 in his dealings. He paid for services and purchased assets, such as real estate, automobiles, dogs, guns, and watches, by such means. Petitioner testified at trial that, although he used cashier's checks extensively in his dealings, he could not remember an instance where he had drawn such a check for more than $ 10,000, which would have triggered the currency reporting requirements of 31 U.S.C. section 5311 et seq. (1988). Such efforts to conceal his financial dealings and income are proof of petitioner's fraudulent intent. We accordingly hold that respondent has carried his burden of proof with respect to the addition to tax for fraud for the years in issue. Addition to Tax for Failure to Make Estimated Tax Payments
Respondent also determined that petitioner was liable for the addition to tax provided by section 6654 because of his failure to make estimated Federal income tax payments for the years in issue. The section 6654 addition is mandatory absent a showing by petitioner that one *694 of the several exceptions provided by statute applies. Grosshandler v. Commissioner, 75 T.C. at 20-21. Petitioner has made no such showing and has failed to carry his burden of proving the inapplicability of section 6654. Baldwin v. Commissioner, 84 T.C. 859, 871 (1985). Consequently, respondent's determination as to the section 6654 addition is sustained. Self-Employment Tax
Respondent determined that petitioner was liable for the self-employment tax provided by section 1401 for each of the years in issue. Petitioner bears the burden of showing respondent's determination with respect to his liability to be incorrect. Rule 142(a). Petitioner, however, introduced no evidence with respect to the self-employment tax issue, and we therefore sustain respondent's determination. Kasey v. Commissioner, 33 T.C. 656, 660 (1960). To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. Except as otherwise noted, all statutory references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. We note that the absence of records is not a prerequisite to the use of indirect methods of proving income. Holland v. United States, 348 U.S. 121, 131-32 (1954); United States v. Lowder, 492 F.2d 953, 957 (4th Cir. 1974), cert. denied 419 U.S. 1092 (1974); Bushnell v. Commissioner, 49 T.C. 296, 311↩ (1967) (Raum, J., concurring).
3. Where income is determined under the cash expenditures method, establishment of a precise opening net worth is not necessary; rather, the requirement is satisfied if respondent's determination shows the extent to which assets on hand at the beginning of the period could have accounted for expenditures during the years in issue. Petzoldt v. Commissioner, 92 T.C. 661, 695↩ (1989).
4. Taylor v. Commissioner, T.C. Memo. 1988-389; Martin v. Commissioner↩, a Memorandum Opinion of this Court dated September 22, 1952.
5. Tangent Development Corp. v. Commissioner, T.C. Memo. 1990-537↩.